**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ROCKWELL AUTOMATION, INC. and ROCKWELL AUTOMATION TECHNOLOGIES, INC., <br><br>                  Plaintiffs, <br><br> v. <br><br> WAGO CORPORATION and WAGO KONTAKTTECHNIK GMBH & CO. KG, <br><br>                  Defendant. | Case No. 3:10CV718-WMC |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants WAGO Corporation ("**WCP**") and WAGO Kontakttechnik GmbH & Co. KG ("**WKT**") herein reply to the response by Plaintiffs Opposition (Dkt. 83, hereinafter "**Opposition**" or "**Opp.**") to WCP and WKT's Motion for summary judgment (Dkt. 51, hereinafter "**Motion**") and the Brief in support of the Motion. (Dkt. 52, hereinafter "**Brief**") At issue are four of the six counts of patent infringement originally alleged in the Complaint (Dkt. 1): Count Two, U.S. Patent No. 6,745,232 (the "**'232 Patent**"); Count Three, U.S. Patent No. 6,801,813 (the "**'813 Patent**"); Count Five, U.S. Patent No. 7,065,415 (the "**'415 Patent**"); and Count Six, U.S. Patent No. 7,123,974 (the "**'974 Patent**"). Counts One and Four were dismissed. (Dkt. 33, 34)

This reply brief does not attempt to restate the arguments in support of the Motion which are made in the Brief filed on April 13, 2012. (Dkt. 52) The opening Brief remains WCP and WKT's principal statement of points and authorities supporting their Motion, and this paper is limited to addressing certain points raised by the Opposition brief. (Dkt. 83) WCP and WKT respectfully submit that their Motion has merit and should be granted.

I.    **EVIDENTIARY ISSUES**

    A.    **Evidentiary Issues Discussed by Plaintiffs in Their Opposition**

Plaintiffs' Opposition (Dkt. 83) leads with an attack on WCP and WKT's evidence; however, as discussed below, Plaintiffs do not show that the material cited by WCP and WKT in support of their Motion "cannot be presented in a form that would be admissible in evidence." Fed. R. Ev. 56(c)(2).

          1.    **Prior Art References Relied on by Dr. Hooper**

For example, Plaintiffs contend that certain materials are not properly authenticated by a declaration executed by counsel for WCP and WKT.  (Dkt. 83, Opp. at 11-12)  WCP and WKT are resubmitting those materials herewith as exhibits to a declaration executed by Dr. Richard Hooper, who relied on them in his Declaration of Richard Hooper, Ph.D., PE., and his Supplemental Declaration of Richard Hooper, Ph.D., PE.  (Response to PPF, ¶ 20)  In addition, within the text of the supplemental declaration itself, Dr. Hooper provides screen shots comparing excerpts from the CoDeSys 1.5 (1997), the WAGO-I.O-PRP (1999), and the CoDeSys 2.3 manuals in the context of discussing the '232 Patent (Response to PPF, ¶ 20), and Dr. Hooper provides screen shots comparing excerpts from the CoDeSys 2.2 (2001) and the CoDeSys 2.3 manuals in the context of discussing the '974 Patent.  (Response to PPF, ¶ 20) Furthermore, the materials were served under Rule 26(a)(2) with Dr. Hooper's declarations. (Response to PPF, ¶ 20)  Dr. Hooper's reliance on the materials in question supports their admissibility, at least, under the learned treatise rule as well as under the residual exception to the hearsay rule.  *See* Fed. R. Ev. 803(18), 807.  It is clear that the materials relied on by Dr. Hooper can "be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

## 2.   Plaintiffs' Misuse of Federal Rule of Civil Procedure 36

In addition, Plaintiffs' Opposition includes a digression into a discovery issue concerning Plaintiffs' efforts to misuse Federal Rule of Civil Procedure 36 by propounding a set of requests for admission purporting to require WCP and WKT to make blanket admissions as to the authenticity, genuineness, business records status and admissibility of a mass of approximately 24,000 pages of individually Bates-numbered documents, as well as approximately 5.5 GB of material on Bates-numbered CDs and DVDs, as well as documents produced on paper — taking such documents as a whole for the purpose of admission.  (WCP and WKT's Response to PPF, ¶ 21)  There is nothing in Defendants' Responses and Objections to Plaintiffs' Second Set of Requests for Admission to support Plaintiffs' argument that denying that all of an undifferentiated mass of approximately 24,000 pages of individually Bates-numbered documents, as well as approximately 5.5 GB of material on Bates-numbered CDs and DVDs is authentic, genuine, a business record, or admissible is that same as admitting that none of it is authentic, genuine, a business record, or admissible.  (WCP and WKT's Response to PPF, ¶ 21)

## 3.   The IBM Dictionary of Computing

Plaintiffs criticize WCP and WKT's Brief for citing the 1987 edition of the IBM Dictionary of Computing rather than the 1994 edition, particularly with regard to the term "data field," which is used in Claim 29 of the '947 Patent and which WCP and WKT argue is a term relating to the use of databases.  In "damning" WCP and WKT (Opp. at 27) for not citing the ostensibly "broader" definition in the 1994 version, Plaintiffs quote that definition without also quoting the definitions of the defined terms "record" and "attribute," which the 1994 IBM Dictionary of Computing uses to define "data field," or the defined term "entity," which the 1994 IBM Dictionary of Computing uses to define "attribute."  If Plaintiffs had done so, it would have been clear that WCP and WKT are absolutely correct in their argument that the claim term "data

field" should be understood as a term relating to the use of databases.  The 1994 IBM Dictionary of Computing defines "data field" as:

> (1) <u>A component of a record corresponding to an attribute</u>. (T)   (2) in IMS/VS, any designated portion of a database segment.  A segment may contain one or more data fields.  (3) In SAA advanced Common User Access, the dialog Manager term for an area in which a user types information.

(WCP and WKT's response to PPF, ¶ 51, emphasis added)  In addition, the 1994 IBM Dictionary of Computing defines "record" (used in the definition of "data field") as:

> (1) In programming languages, an aggregate that consists of data objects, <u>possibly with different attributes</u>, that usually have identifiers attached to them.  In some programming languages, records are called structures. (I)  (2) <u>A set of data treated as a unit</u>. (T)  (2) A set of one or more related data items groups for processing (4) In VTAM, the unit of data transmission for record mode.  A record represents whatever amount of data the transmitting mode chooses to send.  (5) In COBOL, synonym for logical record.  See current record, fixed length record, next record, report writer logical record, variable length record.

(*Id.*, emphasis added)  Furthermore, the 1994 IBM Dictionary of Computing defines "attribute" (used in the definition of "data field") as:

> (1) <u>A named property of an entity</u>.  (2) A terminal display language or transformation definition language (TDL) keyword that specifies a particular quality for the TDL object with which it is associated.  (3) In AIX graphics, a parameter that can affect the "color."  If it is set to "RED," it will remain red until it is changed, and everything that is drawn will be drawn in red.  Other attributes include linestyle, linewidth, pattern, and font.  See also pipeline options (4) In the AS/400 Business Graphics Utility, a characteristic that determines the chart format.  (5) <u>In an SQL database design, a characteristic of an entity; for example, the telephone number of an employee is one of that employee's attributes</u>. (6) In FORTRAN, a property of a data object that may be specified in a type declaration statement, namely data type, type parameters, rank, shape, whether variable or constant, initial value, accessibility (PUBLIC or PRIVATE) , intent (IN, OUT, or INOUT), whether allocable, whether alias, whether optional, whether to be saves, and whether ranged.  See value attribute.

(*Id.*, emphasis added)  Finally, the 1994 IBM Dictionary of Computing defines "entity" (used in the definition of "attribute") as:

> (1) Any concrete of abstract thing of interest, including associations among things: for example, a person, object, event, or process that is of interest in the context under consideration, <u>and about which data may be stored in a database</u>.

> (T)  (2) In Open Systems Interconnection architecture, an active element within a subsystem.  Cooperation between entities in a layer is controlled by one or more protocols.  (T)  (3) In RACF, a user group, or resource that is defined to RACF; for example, a DASD data set or VM minidisk.  (4) In FORTRAN, a program unit, a procedure, an operator, an interface block, a common block, an input-output unit, a statement function, a type, a named variable, an expression, a component of a type, a symbolic constant, a statement label, a construct, an exponent letter, a range list, or a condition.  See data entity, global entity, local entity, statement entity.

(*Id.*, emphasis added)  Thus, the dictionary proffered by Plaintiffs actually supports rather than contraverts WCP and WKT's point that the claim term "data field" is used in the Claim 29 of the '974 Patent definition in a manner that relates to the use of databases.  (Dkt. 83, Opp. at 27)

### 4.    Attempt to Engage in Further Briefing on Motion for Sanctions

Plaintiffs seek to engage in further briefing on their pending Motion for Sanctions, which relates to references cited in Dr. Hooper's supplemental expert report; however, that motion is already fully briefed and Plaintiffs' comments in their opposition brief add nothing of substance. (Dkt. 35, 45, 66; Response to PPF, ¶ 22)

## B.    Evidentiary Issues Raised by Plaintiffs' Opposition

### 1.    Rule 26(a)(2) Reports Submitted by Plaintiffs' Expert

Plaintiffs' Opposition bases its discussion of Patent Invalidity almost entirely on two proposed findings of fact: (1) that Plaintiffs' expert report on infringement was served February 24, 2012 (DPF, ¶ 7, cited in Opp. at 4, 5, 60) and (2) that Plaintiff's expert report on validity was served March 23, 2012.  (DPF, ¶ 9, cited in Opp. at 56, 60, 64, 65, 67, 68, 69, 70, 71, 73, 74, 76, 81, 82, 83, 84)

WCP and WKT do not view the May 4, 2012 Declaration of Arthur Zatarain as adequate verification to convert unsworn expert reports from a non-evidentiary discovery document into testimony:

I, Arthur Zatarain, PE, declare as follows:

1.      I have been retained by Plaintiffs Rockwell Automation, Inc. and Rockwell Automation Technologies, Inc. ("Rockwell") as a technical expert consultant and potential testifying expert witness in the above captioned lawsuit. I have personal knowledge of the following facts and the contents submitted in each of the attached exhibits and if called to testify, I could and would testify competently thereto.

2.      Attached as Exhibit AA is a true and correct, complete copy of my opening expert report and supporting test report that is dated and was served on February 24, 2012 ("Zatarain I").

3.      Attached as Exhibit BB is a true and correct, complete copy of my first supplemental expert report and supporting test report that is dated and was served on March 2, 201 2 ("Zatarain II").

4.      Attached as Exhibit CC is a true and correct, complete copy of my expert report that is dated and was served on March 23, 2012 which is in opposition to Defendants' expert's February 24, 2012 Declaration ("Zatarain III").

(WCP and WKT's response to PPF, ¶ 7)  Given the wording of the declaration, it is not clear whether Plaintiffs' expert is attesting (i) to the fact that the copies of his reports attached to the declaration are true, correct and complete copies or (ii) to the fact that the substance of the reports is true, correct and complete and that he would testify to everything in his expert reports. Unsworn expert reports are "not affidavits, hence not, strictly speaking, admissible to support or oppose summary judgment." *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996) (citing Fed. R. Civ. P. 56(e); *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989); *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 481-82 (6th Cir. 2008); *Loeffel Steel Prods. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 884 (N.D. Ill. 2005).

WCP and WKT's concern is heightened by the testimony of Plaintiffs' expert that a substantial portion of what is contained his reports was written by Plaintiffs' counsel:

Q   Are there any sections of these reports that did come from previous reports?

A   I don't think in this case, no.  I think all that was either provided as a template form with the legal information, and then I provided all the technical discussion and opinions.

> Q   As a percentage, how much of the reports came -- are from the template and how much are the information that you added?
>
> A   I couldn't say.  We'd have to look because a lot of it repeats over and over, so it may be a lot of the bulk, but it's actually the same words.  It's just either way they want to structure the report, each section pretty much stands alone.  There's a lot of repetition in there.  So if you reduced all of that down to one, then my content would be very large.  But if you look at how many times it's been duplicated, then my content would shrink.  But my content relates to the technical discussion and then the opinions.  I couldn't give you a percentage.

(WCP and WKT's response to PPF, ¶ 7)  Plaintiffs' expert also testified that his expert reports were created from Word documents provided to him by Plaintiffs' counsel:

> Q   When you receive content from plaintiffs' counsel for the report that we just discussed, what form did that come in?
>
> A   I'm sorry, I missed the first part.
>
> Q   You mentioned -- we had the discussion about the content that you got from plaintiffs' counsel in the report. What form did it come in?
>
> A   In a Word document.

(WCP and WKT's response to PPF, ¶ 7)

### 2.   Plaintiffs' Reliance on Their Own Out-of-Court Statements

#### a.   Plaintiffs' Infringement Contentions

Plaintiffs rely on their infringement contentions dated September 16, 2011 to show the truth of the matters asserted in the infringement contentions.  For example, PPF, ¶ 101 states:

> With regards to the infringement of Defendants' accused products with respect to Claim 1 of the '415 patent, Rockwell's Infringement Contentions served on September 16, 2011 states:
>
> > WAGO-I/O-System devices have the ability to compile source code into a control program that can be executed by the control device . . .
> > CoDeSys supports writing control programs in ladder diagram format. . .
> > CoDeSys contains an editor for developing ladder logic programs . . .
> > Writing files - Using the "SysLibFile.lib"
> > This section shows how to write data to a file.

(PPF, ¶ 101; *see also* PPF, ¶ 1, 19)  That proposed finding, based on unadorned hearsay, is cited in Plaintiffs' opposition brief in an effort to overcome the fact that Plaintiffs' expert reports do

not provide a theory of infringement of the '415 Patent.  (Dkt. 83, Opp. at 49)

### b.    Papers Submitted by Plaintiffs to the U.S.P.T.O.

Plaintiffs' Exhibit V (PPF, ¶ 111) is a non-official copy of a written argument presented by Plaintiffs to the U.S. Patent and Trademark Office in connection with the prosecution of the '813 Patent.  The document is hearsay when offered by Plaintiffs to establish the truth of the statements contained in the document.  The document is also irrelevant, because it is cited in a discussion of the '415 Patent, not the '813 Patent (Dkt. 83, Opp. at 52); however, Plaintiffs may have intended to offer a non-official copy of a different office action, one that was presented by Plaintiffs in connection with the prosecution of the '415 Patent, which has been entered in the record as Exhibit 1 (Dkt. 57-1) in support of WCP and WKT's motion for summary judgment. (DPF, ¶¶ 351-54)  Plaintiffs have offered the document in question to support their argument that the disputed claim language *to log data to a file containing ladder logic instructions* should be treated as if it read *to use ladder logic instructions to log data to a file.*  (PPF, ¶ 111, as cited in Dkt. 83, Opp. at 56)  Whichever document Plaintiffs had intended to offer, both are hearsay when offered by Plaintiffs to show the truth of matter asserted by Plaintiffs in their arguments to the U.S. Patent and Trademark Office, even though such documents may be used by WCP and WKT as statements by a party opponent. Fed. R. Ev. 801(d)(2).

Similarly, Plaintiffs' Exhibit K (PPF, ¶ 31, cited in Plaintiffs' opposition, Dkt. 83 at 20-21) is a non-official copy of a written argument presented by Plaintiffs to the U.S. Patent and Trademark Office in connection with the prosecution of the '974 Patent.

### 3.    Document Used As Exhibit 10 at Dr. Hooper's Deposition

Plaintiffs' Exhibit T (Dkt. 88-20) is discussed by Plaintiffs as "Exhibit 10" to Dr. Hooper's deposition as though the document had been identified and authenticated by Dr. Hooper.  (PPF, ¶ 87)  That document is discussed in Plaintiffs' Opposition for the truth of the

matters asserted in the document and not for what Dr. Hooper says about the document (Dkt. 83 at 43), even though the document is a third-party document which Dr. Hooper was never asked to identify and on which Dr. Hooper disagreed with Plaintiffs' counsel as to the meaning of the document's contents:

> MR. TANCK:  Mark this next in order.
>
> (Exhibit 10 was marked.)
>
> Q.  (BY MR. TANCK)  Dr. Hooper, I'm handing you what's been marked as Hooper 10.
>
> A.  Okay.
>
> Q.  Can you turn to the page marked ROCK0050005?
>
> A.  Okay.
>
> Q.  It says:  Does CoDeSys generate native code, C code or interpreter code? Do you see that?
>
> A.  I do see that.
>
> Q.  And it says:  CoDeSys supports all of the above back ends.  The back end is made up of the code generation plus a customized runtime system.
>
> Do you see that?
>
> A.  I do.
>
> Q.  And the first page of this document talks about CoDeSys frequently asked questions.
>
> Do you see that?
>
> A.  I do.
>
> Q.  Does this portion of the frequently asked questions section from CoDeSys change your opinion that the CoDeSys product provides a code interpreter?
>
> A.  No.  In fact, it's -- it's quite the opposite. It talks specifically about compiling for native code, such as the Intel 8086, the Motorola 68 series, the Siemens -- the Siemens, the Strongarm and the PowerPC processor.  So this -- this is talking about compiling code.
>
> Yes, I do see where it says interpreter code, but I -- I saw no evidence of that on the WAGO system.

Q.  But you didn't review all of the functionality that's provided by the WAGO system, correct?

A.  I used it as -- as the manual directs a user to use it, and -- and saw no -- no interpreter code.

Q.  Can you be a hundred percent sure as you sit here today that the WAGO-I/O system does not provide a back end to support interpreted code?

A.  All I can say is that I did not find one and the manual did not mention one. But that's all I can be certain of.

Q.  And when you say you didn't find one, what did -- what is the basis for that statement?

A.  That I didn't -- I didn't see -- I didn't see a way to execute code that was not compiled.  I just didn't -- I didn't see that functionality in any -- in the manual at all or in -- or in running the system.

(WCP and WKT's Response to PPF, ¶ 87)

Similarly, the documents at Exhibit Z (Dkt. 88-26) are identified as Exhibits 37 and 38 to the Rule 30(b)(6) deposition of WKT employee Dr. Thomas Albers, even though Dr. Albers testified that he had never seen the documents and Dr. Albers' testimony did not support the points for which Plaintiffs appear to offering the documents.  (WCP and WKT's responses to PPF, ¶¶ 122-23)  Furthermore, the documents do not contain the language attributed to them in Plaintiffs' opposition.  (WCP and WKT's Response to PPF, ¶¶ 122-23)

## II.    OTHER ISSUES

### A.    Non-Infringement of the Patents in Suit

It is the plaintiff's burden to show the presence of every element of each asserted patent claim, or its equivalent, in the accused device.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).

For the '813 Patent and the '974 Patent, the non-infringement issues presented in WCP and WKT's opening Brief in support of summary judgment include dispositive issues of claim construction. (Dkt. 52 at 24-29, 34-35)  For the '415 Patent, Plaintiffs' opposition to the

summary judgment motion raises a new issue of claim construction by arguing that the term *logging data to a file containing ladder logic instructions* should be construed to mean *using ladder logic instruction to log data to a file*.  (Dkt. 83 at 50-51)  On these issues, where claim meaning is dispositive as to whether Plaintiffs can carry their burden of proof on infringement, Plaintiffs argue that the appropriate claim construction is the "plain meaning" without providing a clear idea of what the Court should rely on to determine what the "plain meaning" is and without explaining why the asserted "plain meaning" is an appropriate construction of the undoubtedly technical terms at issue.  (Dkt. 83, Opp. at 18-28; 37-41, 50-53)  Plaintiffs thus ask the Court to commit error by submitting an issue of claim construction to the jury as a question of fact.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) ("the courts construe patent claims as a matter of law and should not give such task to the jury as a factual matter").

### 1.      Non-Infringement of the '232 Patent

Plaintiffs mischaracterize WCP and WKT's brief as conceding infringement.  There is no such concession.  The asserted patents are presumed to be valid and not infringed.  As discussed in WCP and WKT's Brief (Dkt. 52), the features of the products that are accused by Plaintiffs of infringing the '232 Patent are software features of CoDeSys 2.3 (2003) which have been carried over from CoDeSys 1.5 (1997), which predates the priority date of the '232 Patent.  (DPF, ¶¶ 16-24)  Therefore, WCP and WKT observe, facts marshaled to prove infringement will also invalidate the patent.  That is not the same as a concession of infringement, because accused features of CoDeSys 2.3 (2003) may be <u>both</u> carried over from features of CoDeSys 1.5 (1997) <u>and</u> non-infringing.  Indeed, a determination of non-infringement would uphold the validity of the patent.  *See* 35 U.S.C. § 282 (a patent is presumed valid).

Plaintiffs' opposition does not specify features of CoDeSys 2.3 (2003) which Plaintiffs are required by Plaintiffs' theory of infringement and which are not shared with CoDeSys 1.5 (1997).

### 2.    Non-Infringement of the '813 Patent

The issue of infringement of the '813 Patent comes down to a matter of claim construction, specifically whether the claim term *interpret* (in various grammatical forms) can rightly be construed to encompass the use of *compiled* computer code when there is a fundamental and well-recognized distinction between *interpreted* computer code and *compiled* computer code.  (DPF, ¶¶ 157-86)  Absolutely nothing in Plaintiffs' opposition would support the conclusion that the term interpret is not used in the '813 Patent as a technical term, and it is error to submit a technical term to the jury to construe as a question of fact.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) ("the courts construe patent claims as a matter of law and should not give such task to the jury as a factual matter").  Plaintiffs may press the doctrine of equivalents; however, the doctrine of equivalents is applicable only to "insubstantial alterations" to what is set forth in the original patent claim "which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

### 3.    Non-Infringement of the '415 Patent

The only asserted independent claim of the '415 Patent includes a requirement, among others, *to log data to a file containing ladder logic instructions*.  (DPF, ¶¶ 350)  Here, Plaintiffs are inconvenienced by the fact that, while the accused products may be argued to be capable of logging data to a file, it is clear that the accused products are not capable of logging data to a file containing ladder logic instructions.  And it is Plaintiffs' burden of proof on infringement to show such capability.  Prosecution history estoppel makes the doctrine of equivalents

unavailable to Plaintiffs in this connection, because the requirement *containing ladder logic instructions* was among the requirements added by amendment to overcome the initial rejection of independent Claim 1 by the patent examiner.  (DPF, ¶¶ 351-52)  Plaintiffs now argue that the phrase *to log data to a file containing ladder logic instructions* really means *to use ladder logic instructions to log data to a file*.  (PPF, ¶ 111, as cited in Dkt. 83, Opp. at 56)  The Court can take notice that the principles of English grammar simply do not permit such a construction; furthermore, the doctrine of equivalents is not a vehicle for the wholesale rewriting of patent claims, as Plaintiffs urge the Court to do:

> When a patent holder "narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, "by the amendment [the patentee] recognized and emphasized the difference between the two phrases[,] . . . and the difference which [the patentee] thus disclaimed must be regarded as material."

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002) (citation omitted).  The doctrine of equivalents is instead limited to allowing a patent holder to claim "insubstantial alterations" to what is set forth in the original patent claim, "which could be created through trivial changes."  *Id.* at  733.

### 4.   Non-Infringement of the '974 Patent

Plaintiffs do not have a theory of infringement of the '974 Patent that matches the features of the accused products.  Each element of a claim is material and essential, and, in order for a court to find infringement, whether literally or under the doctrine of equivalents, the patent holder must show the presence of each and every element or its substantial equivalent in the accused device.  *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985).  "[T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

Plaintiffs are currently taking the position that the CoDeSys log file is that "tracking component . . ." and that there is no specific feature of CoDeSys that corresponds to the "recording component . . ." and a distinct "tracking component . . ." (Dkt. 83, Opp. at 22)  By arguing that it is not necessary to have a distinct "recording component . . ." and a distinct "tracking component . . . ," Plaintiffs effectively admit that they cannot show that.  (Dkt. 83, Opp. at 18-22)  Similarly, there can be no literal infringement of independent Claim 24 because there is not both a distinct step of "logging the activity data in at least one of a local and a remote location" and a distinct step of "aggregating the logged activity data in the at least one file."  As discussed by WCP and WKT in their opening Brief, the doctrine of equivalents is not available to Plaintiffs to consolidate the separate logging and aggregating requirements of Claim 24 into a single component or step.  That is because Plaintiffs' arguments to the patent examiner to overcome rejection of the '974 Patent emphasized the distinctness of the "recording component . . ." and "tracking component . . ." of Claim 1 and stated that the arguments were equally applicable to the steps of "logging the activity data in at least one of a local and a remote location" and of "aggregating the logged activity data in the at least one file" in Claim 24.  (DPF, ¶ 441)

After the filing date of WCP and WKT's summary judgment motion, Plaintiffs' expert testified that the CoDeSys log file represents the tracking component rather than the recording component; however, Plaintiff's expert was not, at that time, able to identify a distinct recording component:

> Q   What about the next -- the tracking component?  It says, "A tracking component to aggregate the realtime interactions to facilitate generation of audit data relating to the one or more industrial control components."
>
> Do you see that?
>
> A   Yes.

Q    So where is that found in the accused products?

MR. TANCK:  Object to form.

A    My recollection is that it would be when the tracking component gets stored -- the tracking component puts the information into the database that's being generated by CoDeSys, and it can also retrieve it from the database for presentation to the user.

BY MR. COOK:

Q    So your testimony is that there's a database in CoDeSys where this goes?

A    I believe that's correct, yes.

Q    So would you describe that database?

A    It's a programming system inside of CoDeSys that receives the information that it wants to store, stores it into some sort of a structure.  I haven't seen the source code for that, but there's some sort of a structure or format.  Stores it into the log file, which is a file that's created and maintained by CoDeSys.  And stores it with certain attributes such that it can be retrieved in an organized manner.  And that's the aggregation part that takes place.

Q    So how does this differ from the log file?

A    A log file in my experience is nothing but a sequential recording of information that may not even have a fixed structure.  It's just logging.  It typically would have a time stamp, but it could be just a message.  It could be a data value.  It could be anything that just tends to be sequentially one right after the other.

Q    So a log file would be just a sequence of things that are logged; is that what it would be?

MR. TANCK:  Object to the form.

A    In my experience the terminology "logging" is -- would not have to have a database structure.  You could.  You'd call it -- historian is another term that's used.  But just logging is, in its purest form, is just storing it one after the other without necessarily having any structure or aggregation to it.

In some systems you simply log to a piece of paper to a printer.  That's it.  You print it out, and that's it.  There's no storage of it at all, but it's still being logged.

In this case, the logging is being done more sophisticated where it's going into a file where it could be later retrieved in some organized way.

BY MR. COOK:

Q    So the creation of a log file, is that the tracking component?

A    It's part of the tracking component.  It's not the only thing.

Q    What's the other part?

A    The storing of data in there and recalling it from the file.

Q    How does that differ from the recording component?

A    The recording component is monitoring the user interaction and determining if it is one of the things that needs to be tracked.  And if it is, it's going to capture that information and pass it to the tracking component.

Q    So does the recording component not do the recording part; is that what you're saying?

MR. TANCK:  Object to form.

A    The recording part -- if you consider it not only gathering information and then passing it to the system that ultimately records it, you can maybe include the recording step, it doesn't matter.  It's going to be recorded.  And where you draw the line doesn't matter.

But there's a recording component that consists of identifying what needs to be stored and then seeing to it that it gets stored.  That's the recording component.

(WCP and WKT's Response to PPF, ¶ 27)  The testimony by Plaintiffs' expert that "where you draw the line doesn't matter" shows: (i) that Plaintiffs are unambiguously contending that a single features of CoDeSys 2.3, the log file, is serving both as the required "recording component . . ." and as the required "tracking component . . . ." and (ii) that Plaintiffs do not have a theory of infringement of the '974 Patent that can point to a distinct "recording component . . ." and a distinct "tracking component . . ." in the accused products.  As discussed by WCP and WKT in their brief in support of summary judgment, because Plaintiffs' arguments to the U.S.P.T.O. to overcome rejection of these claims emphasized that there was a recording component <u>and</u> a tracking component (DPF, ¶ 441), the doctrine of argument-based estoppel forecloses Plaintiffs' ability to argue the doctrine of equivalents.  "Arguments made during the prosecution of a patent application are given the same weight as claim amendments."  *Elkay Mfg. Co. v. Ebco Mfg. Co.*,

192 F.3d 973, 979 (Fed. Cir. 1999).

In essence, Plaintiffs are arguing that the specification of the '974 Patent would have supported a hypothetical claim in which recording and tracking were done by a single component, if such a claim had been applied for in the first place, and that Plaintiffs would like to have the actual claims of the '974 Patent to be rewritten along the lines of the hypothetical claim. WCP recognize that such a rewrite might help Plaintiffs, not only with infringement, but also with validity under 35 U.S.C. § 112, as discussed below; however, "courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

The issue of infringement of independent Claim 29 remains a matter of claim construction, because Claim 29 requires, among other things, three distinct elements: (1) "a first data field representing real time access data to an industrial control component," (2) "a second data field representing a tag name to store and aggregate the real time access data," and (3) "a third data field to categorize the real time access data." (DPF, ¶ 429) WCP and WKT argue that, as a matter of claim construction, the term "data field" applies to databases and that the accused products do not have databases. (Dkt. 52 at 34-35) Plaintiffs responded by attacking some of the evidence on claim construction, as discussed above. However, Plaintiffs' quarrel about whether the 1987 or the 1994 version of the IBM Dictionary of Computing is more reliable for understanding the term "data field" merely reinforces the conclusion that the term should be understood as requiring the use of a structured database to which the required "first data field . . . ," "second data field . . . ," and "third data field . . ." relate. As with Claims 1 and 24 of the '974 Patent, the doctrine of equivalents does not allow a patent holder to delete entire elements of a claim but is applicable only to "insubstantial alterations" to what is set forth in the original patent claim "which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku*

-17-

*Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

Finally, as with the '232 Patent, the features of the products being accused of infringement are software features of CoDeSys 2.3 (2003) which have been carried over from CoDeSys 2.2 (2001), which predates the priority date of the '974 Patent, which is November 19, 2002.  (DPF, ¶ 421)  WCP and WKT observe that, as a result, facts marshaled to prove infringement will also invalidate the patent.  Plaintiffs may wish to characterize this observation as a concession of infringement; however, the accused features of CoDeSys 2.3 (2003) may be <u>both</u> carried over from features of CoDeSys 2.2 (2001) <u>and</u> non-infringing.  Indeed, a determination of non-infringement would uphold the validity of the patent.  *See* 35 U.S.C. § 282 (a patent is presumed valid).

Plaintiffs' opposition does not specify features of CoDeSys 2.3 (2003) which Plaintiffs are required by Plaintiffs' theory of infringement and which are not shared with CoDeSys 2.2 (2001).

### B.      Invalidity of the Patents in Suit

Plaintiffs' opposition to WCP and WKT's invalidity arguments largely consist of objections to the evidence and arguing with WCP and WKT's proposed findings of fact.  The patent invalidity section of Plaintiffs' opposition brief cites to only six of Plaintiffs' 124 proposed findings of facts:  PPF, ¶ 1 (cited in Opp. at 61); PPF, ¶ 7 (cited in Opp. at 60); PPF, ¶ 9 (cited in Opp. at 56, 60, 64, 65, 67, 68, 69, 70, 71, 73, 74, 76, 81, 82, 83, and 84); PPF, ¶ 119 (cited in Opp. at 58); PPF, ¶ 120 (cited in Opp. at  62); and PPF, ¶ 121 (Opp. at 62).  Thus, notwithstanding Plaintiffs' 30 pages of rhetoric devoted to WCP and WKT's invalidity arguments (Dkt. 83, Opp. at 55-84), the substance of Plaintiffs' opposition to the patent invalidity portion of WCP and WKT's summary judgment motion is really to be found in

Plaintiffs' responses to WCP and WKT's proposed findings of fact which relate to patent invalidity.  (DPF, ¶¶ 25-148; DPF, ¶¶ 187-344; DPF, ¶¶ 363-419; DPF, ¶¶ 464-574)

With regard to the '232 Patent, one of the prior art references against CoDeSys 2.3 software is an earlier version of the same software, CoDeSys 1.5 (1997).  Plaintiff's opposition on the issue of whether the WCP and WKT infringe the '232 Patent does not propose that any features of CoDeSys 2.3 which are alleged to be required for infringement are not shared by CoDeSys 1.5 (1997).

## III.    CONCLUSION

For the foregoing reasons, and for the reasons stated in the Brief in Support of Motion for Summary Judgment dated April 13, 2012 (Dkt. 52), WAGO Corporation and WAGO Kontakttechnik GmbH & Co. KG respectfully ask the Court to grant their Motion for Summary Judgment in favor of Defendants on all counts.

Date: May 14, 2012                         Respectfully submitted,

                                           /s/  Robert N. Cook
                                           _____
                                           Robert N. Cook
                                           Whitham, Curtis, Christofferson & Cook, P.C.
                                           11491 Sunset Hills Road, Suite 340
                                           Reston, Virginia 20190
                                           (703) 787-9400 (voice)
                                           (703) 787-7557 (fax)
                                           bob@wcc-ip.com

                                           John C. Scheller
                                           Michael Best & Friedrich LLP
                                           One South Pinckney Street, Suite 700
                                           Madison, Wisconsin 53703
                                           (608) 283-2276 (voice)
                                           (608) 283-2275 (fax)
                                           jcscheller@michaelbest.com

                                           Counsel for Defendants
                                           WAGO CORPORATION and
                                           WAGO KONTACTTECHNIK GMBH & CO. KG

**CERTIFICATION**

I certify that on May 14, 2012, I caused the foregoing DEFENDANTS' REPLY IN

SUPPORT OF MOTION FOR SUMMARY JUDGMENT to be electronically filed with the

Clerk of Court using the Court's Case Management/Electronic Case Filing ("CM/ECF").  All

parties are represented by attorneys of record registered with CM/ECF and will receive service

electronically.  There is no party requiring a different form of service under the Court's

electronic filing procedures

/s/  Robert N. Cook
_____
Robert N. Cook
Whitham, Curtis, Christofferson & Cook, P.C.
11491 Sunset Hills Road, Suite 340
Reston, Virginia 20190
(703) 787-9400 (voice)
(703) 787-7557 (fax)
bob@wcc-ip.com